**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| ALBERT ALLEN,<br><br>          **Plaintiff,**<br><br>v.<br><br>WEXFORD HEALTH SOURCE, INC.,<br>JILIAN CRANE,<br>ANTHONY WILLS,<br>LATOYA HUGHES,<br>J.B. PRITZKER,<br>PERCY MYERS,<br>GLEN BABICH, and<br>ALISA DEARMOND,<br><br>          **Defendants.** | **Case No. 24-cv-02122-SPM** |

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

This matter is before the Court on Motions for Summary Judgment on the issue of exhaustion filed by Defendants Director Hughes, Governor Pritzker, and Warden Wills (IDOC Defendants) and Defendants Dr. Babich, NP Crane, NP Dearmond, Dr. Myers, and Wexford Health Sources, Inc. (Wexford Defendants). (Doc. 45, 48). Plaintiff has filed a response in opposition, and Defendants filed reply briefs. (Doc. 53, 58, 61). Plaintiff filed a sur-reply. (Doc. 60).

### BACKGROUND

Plaintiff Albert Allen, an inmate of the Illinois Department of Corrections (IDOC) incarcerated at Menard Correctional Center (Menard), initiated this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. In the Complaint (Doc. 1), Plaintiff alleges that he

began experiencing stomach pain in 2019. (*Id.* at p. 6). He states that the pain continued to increase and that by 2020, the pain was excruciating. (*Id.*). Plaintiff submitted several sick call slips and was seen by Dr. Siddiqui in January 2020. (*Id.*). Plaintiff recounts that he was sent to Chester Memorial Hospital on January 21, 2020, where he was diagnosed with an umbilical hernia. (*Id.* at p. 6, 45). He was told by a medical provider at the hospital that the hernia could be repaired with surgery, but that Menard would need to arrange for a surgical consultation. (*Id.* at p. 7). When Plaintiff returned from the hospital, he asserts he was seen by a nurse who confirmed that he had a hernia that was reducible. (*Id.*). Plaintiff alleges that the nurse told him that "Wexford has a policy in place that they don't do surgery until the hernia is strangulated." (*Id.*). Plaintiff told the nurse that he was in pain and that it hurt when he "defected, sneezed, [and] coughed." According to Plaintiff, the nurse told him to "man up and deal with it." (*Id.*). Plaintiff was not scheduled for consultation or surgery. (*Id.*).

Three years later, on June 15, 2023, Plaintiff discovered blood in his urine and collapsed in his cell. (Doc. 1, p. 9). Plaintiff states he was taken to the health care unit and seen by a nurse. (*Id.* at p. 9, 15-16, 54). During the appointment, Plaintiff informed the nurse he had a hernia. (*Id.* at p. 23). The nurse, however, only gave Plaintiff Tylenol and sent him back to his cell without any diagnostic testing. (*Id.* at p. 9, 15-16). According to Plaintiff and the medical records, the nurse called Dr. Myers for consultation and notified Dr. Myers of Plaintiff's medical issues. (*Id.* at p. 24, 54, 83). The next day, Plaintiff had an appointment with NP Crane. (*Id.* at p. 20, 21, 23, 33, 54-55, 82). NP Crane told Plaintiff that the blood in his urine was "more than likely caused by him passing a kidney stone." (*Id.* at p. 20). Plaintiff asserts that NP Crane did not physically examine him or send him for further testing before making this diagnosis and simply "guessed." (*Id.* at p. 21). Despite telling NP Crane about his hernia, she would not address his hernia during the appointment

Page 2 of 16

and told him that he would need to submit a separate sick call request. (*Id.* at p. 22-23, 25).

Plaintiff returned to the health care unit on a weekly basis for further urine testing, and on each visit, he asserts that NP Crane continued to refuse to treat his hernia. (Doc. 1, p. 22-23). Plaintiff eventually submitted a sick call request as instructed and had an appointment for his hernia with a nurse on July 25, 2023. (Doc. 1, p. 24). Plaintiff was referred by NP Dearmond for a surgical evaluation on August 8, 2023, and he receive hernia repair surgery sometime after November 2023. (*Id.* at p. 72-73).

Following a merit review of the Complaint pursuant to 28 U.S.C. § 1915A, Plaintiff is proceeding on an Eighth Amendment claim against Wexford Health Sources, Inc. (Wexford), Jilian Crane, Anthony Wills, Latoya Hughes, J.B. Pritzker, Percy Myers, Glen Babich, and Alisa Dearmond for deliberate indifference to Plaintiff's serious medical need, a hernia and associated pain (Count 2). (Doc. 17).

### SUA SPONTE DISMISSALS

In the Merit Review Order, the Court found that Plaintiff had stated a claim against the IDOC Defendants, who are upper-level officials, by sufficiently pleading that they knew of Wexford's hernia surgical repair policy and its impact on Plaintiff but "turned a blind eye" based on letters he wrote to them on June 28 and August 13, 2023, and the number of previous lawsuits in this Circuit regarding Wexford's guidelines concerning hernia surgeries. (Doc. 7, p. 8-9). However, upon further review of Plaintiff's Complaint, the Court finds that Plaintiff has not stated a plausible claim against the upper-level officials, Warden Wills, Director Hughes, and Governor Pritzker, for deliberate indifference to his hernia and associated pain. In the Complaint, Plaintiff states that in the first letter he complained that because of "staff shortages," he was not receiving "out of cell exercise, medical care, and treatment." (Doc. 1, p. 16, 28). In the second letter, Plaintiff

asserts that he notified Defendants that nurses were "running the HCU and making the diagnoses in direct violation of the Wexford manual." (*Id.*). He goes on to state that these letters put Defendants on notice that he was receiving inadequate medical care due to deliberate understaffing, which makes it impossible to be seen by a medical provider. (*Id.*).[1] But these letters make no mention of Wexford's hernia repair policy or that Plaintiff was being denied proper treatment for his hernia because of such policy. Plaintiff also does not inform Defendants in the letters about not being provided with effective pain medication for his hernia. In fact, his hernia does not seem to be mentioned.

While there are instances when inmates are allowed to proceed against prison officials on the premise that they did not adequately investigate a serious issue identified in detailed communications, including grievances or letters, here, Plaintiff's allegations do not meet this standard. *See e.g., Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) (an inmate's highly detailed correspondence to prison administrators may form the basis for deliberate indifference liability if the administrators turn a blind eye or fail to exercise their authority to investigate). Based on the facts as pled, he did not notify Defendants about his hernia care at all, and so, it is not plausible to infer that they acted with deliberate indifference regarding a serious risk to his health posed by his untreated hernia and pain. Therefore, the Court *sua sponte* dismisses without prejudice Count 2 against Wills, Hughes, and Pritzker. *See Ledford v. Sullivan,* 105 F. 3d 354, 356 (7th Cir. 1997) (stating that "[s]ua sponte 12(b)(6) dismissals are permitted, provided that a sufficient basis for the court's action is evident from the plaintiff's pleading"). The Motion for Summary Judgment filed by the IDOC Defendants is therefore denied as moot. (Doc. 45).

Likewise, the Court dismisses Plaintiff's Eighth Amendment claim against Wexford to the

---

[1] The Court dismissed Count 1 in the Merit Review Order alleging that a policy of inadequate staffing resulted in inadequate care for Plaintiff's hernia and associated pain. (Doc. 7, p. 6-8).

extent he claims that Wexford's record keeping policies and practices, or lack thereof, prevented him from receiving follow-up care after his diagnosis of a hernia in January 2020. (*See* Doc. 1, p. 10). Plaintiff asserts that "Wexford has refused to get an updated medical filing system or electronic filing system that would make it easier to keep track of inmate follow ups and what was done or prescribed to treat that issue and by keeping the paper medical filed this hindered him from receiving adequate medical care in a timely fashion." (*Id.*). This singular statement is conclusory and not supported by any facts in the Complaint.

Plaintiff asserts that following his return from the hospital in January 2020, he had a follow-up appointment with a nurse who confirmed the hernia diagnosis and informed him that Wexford had a policy of not approving hernia repair surgery unless the hernia becomes strangulated. (Doc. 1, p. 7). Plaintiff continued to experience excruciating pain and so he filed an emergency grievance in February 2020 about his pain and the Wexford hernia surgical repair policy. (*Id.* at p. 7-8). After submitting the emergency grievance, another nurse came and told Plaintiff not to file anymore grievances about the health care unit being understaffed or his hernia and that she would ensure he was seen to "hopefully get him the surgery." (*Id.* at p. 8). Plaintiff asserts that he did not receive a response to his grievance and was not scheduled for an appointment. (*Id.*). Plaintiff's allegations then skip ahead to June 2023, when he found blood in his urine caused by a kidney stone or urinary tract infection. (*Id.* at p. 9). The Complaint is void of facts to allow the inference that Plaintiff went for three years without another appointment for his hernia because of known problems with the medical record keeping system implemented by Wexford. *See Bell Atlantic Corp.,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Accordingly, Plaintiff's Eighth Amendment claim against Wexford for policies and practices, or lack thereof, regarding poor record keeping, which prevented Plaintiff from receiving follow-up

care after his diagnosis of a hernia in January 2020 is dismissed.[2]

## PLAINTIFF'S SUR-REPLY

On November 14, 2025, the Wexford Defendants filed their reply brief. (Doc. 58). In the reply, they argue that Plaintiff does not dispute any of their assertions of material fact or support his own assertions of fact by pointing to evidence in the record, even an affidavit or an unsworn statement. (*Id.* at p. 2-3). Because Plaintiff has not supported his statements made in this response brief with admissible evidence, they contend that he has not created a genuine dispute of material fact.

Plaintiff responded by filing a document titled "Plaintiff's Reply to Defendants Motion in Reply to Plaintiff's Reply to Their Motion for Summary Judgment." (Doc. 60). Although sur-replies are typically not allowed in this district, *see* SDIL-LR 7.1(a)(4), Plaintiff appears to be attempting to cure the deficiencies in his response brief by providing a sworn statement. In the sur-reply, Plaintiff repeats arguments and factual assertions that he previously provided in his original response brief. (Doc. 60, p. 4-5; Doc. 53, p. 7-8). At the end, Plaintiff includes an "affidavit of affirmation," and signs the document under the penalty of perjury pursuant to 28 U.S.C. §1746. (Doc. 60, p. 8-9). The Court will treat the sur-reply as a supplemental sworn statement in support of his response and will consider the supplement in ruling on the remaining Motion for Summary Judgment filed by the Wexford Defendants. *See Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016) (holding that district courts are not required to hold pro se litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including by ignoring the deficiencies in their filings and considering the evidence they

---

[2] Count 2 against Wexford has two parts. (Doc. 7, p. 8). The Court does not dismiss Count 2 against Wexford to the extent Plaintiff claims that his Eighth Amendment right to be free of cruel and unusual punishment was violated by the hernia surgical repair policy. (Doc. 7, p. 8).

submit).

## RELEVANT ALLEGATIONS AND FACTS

Plaintiff asserts in his response brief that he first filed an emergency grievance about his hernia pain and inadequate treatment in late February 2020. (Doc. 53, p. 2; Doc. 60, p. 6). He states that in the grievance, he wrote about how his hernia was causing him pain and how medical staff were telling him that Wexford had a policy to "push his hernia back in." (Doc. 53, p. 2). Plaintiff claims that he listed Wexford, Wills, Angela Crain, Dr. Siddiqui, and Moldenhauer as individuals who "had seen him and who had sent him out to Chester Hospital where he was diagnosed as having a hernia." (*Id.* at p. 2-3). Plaintiff alleges that he did not receive a response to this grievance. (*Id.* at p. 3).

At some point after submitting the February 2020 emergency grievance, Plaintiff alleges that an unknown nurse came to his cell with a correctional officer in order to intimidate him into not writing anymore grievances. (Doc. 53, p. 4; Doc. 60, p. 6-7). The nurse informed him that she had received his "complaint by way of his grievance," and she instructed Plaintiff not to file anymore grievances about his hernia, Wexford, or the health care unit being understaffed. (*Id.*). The nurse told Plaintiff that she:

> [W]as gonna make sure that he got seen and that his hernia got addressed, but it was only so much that they could do for his hernia until it gets to a point where it can't be pushed back in or it becomes strangulated and then if necessary they'll recommend surgery…but until the treatment doesn't help or work anymore do not write any more grievances about the issue." (*Id.*).

(*Id.*). Plaintiff asserts that he did not write another grievance because he was afraid that if he wrote more grievances then he would lose his job in the kitchen or be transferred to a cell house with comparably poorer living conditions. (*Id.*).

Plaintiff alleges that he wrote two letters to the counselor inquiring about his February 2020

Page 7 of 16

emergency grievance, but his letters were ignored. (Doc. 53, p. 5).

On July 10, 2023, Plaintiff filed an emergency grievance, Grievance #236-7-23. (Doc. 46-2, p. 5-8). In the grievance, Plaintiff grieves that he collapsed in his cell on June 25, 2023, after urinating blood. He states that he was taken to the health care unit where he was seen by a nurse. Despite the amount of blood Plaintiff had urinated, he complains that the nurse sent him back to his cell because there was "nothing they could do." Plaintiff asserts that he was not examined, diagnosed, or treated by a doctor. He complains that the health care unit is severely understaffed, and there is no doctor at Menard. Plaintiff states he was told that he could have a kidney stone or urinary tract infection, but the nurse was not sure what caused the blood in his urine. Plaintiff writes that he was prescribed medication "anyway." Plaintiff claims that he asked the nurse if the blood could be caused by his hernia, and she responded that she hoped not because Wexford has a policy of not approving hernia repair surgery unless the hernia is strangulated or life threatening, regardless of the pain. Plaintiff states that he is trying to "find out if my hernia could be the reason that the blood is in my urine and if that's the case then I would like to get the right tests done to find this out," and to receive the necessary treatment. He grieves that he is not receiving any answers as to why there is blood in his urine, and he is experiencing emotional distress. Plaintiff fears that he could have cancer or there could be something wrong with his kidneys, bladder, or penis. He requests to be seen by a doctor and/or to have the appropriate tests performed.

Grievance #236-7-23 was designated as an emergency by Warden Wills on July 14, 2023. (Doc. 46-2, p. 5). The Grievance Officer reviewed the grievance, and after receiving a response from the health care unit, deemed the grievance "resolved." (*Id.* at p. 3-4). The Grievance Officer observed that Plaintiff had been seen for symptoms of a urinary tract infection and hernia, and he continued to be treated. (*Id.*). Warden Wills concurred with the recommendation, and Plaintiff

Page 8 of 16

appealed. (*Id.* at p. 3). On December 7, 2023, the ARB denied the grievance finding that the issue was appropriately addressed by the facility and stating that "medical treatment is at the discretion of licensed medical professionals." (*Id.* at p. 2).

Aside from Grievance #236-7-23, there are no other grievances regarding Plaintiff's medical care that were recorded as being appealed to the ARB from January 2019 through January 2025. (Doc. 46-2, p. 1).

## LEGAL STANDARDS

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the non-moving party must identify specific facts in the record showing that genuine issues of material fact exist precluding summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson,* 477 U.S. at 248.

The district court's role on summary judgment is generally not to weigh evidence or judge witness credibility. When presented with a motion for summary judgment on the issue of exhaustion, the district court's approach to factual disputes is different. In *Pavey v. Conley,* 544 F.3d 739, 742 (7th Cir. 2008), the Seventh Circuit instructed district courts to conduct an evidentiary hearing to resolve contested issues of fact concerning exhaustion. The Supreme Court, however, recently partially overruled *Pavey* in *Perttu v. Richards*, 605 U.S. 460, 468 (2025), holding exhaustion disputes must be reserved for a jury if contested facts on exhaustion are intertwined with factual disputes on the merits of a claim. When the district court is presented with

a motion for summary judgment on exhaustion with material facts in dispute, it must consider whether intertwinement between exhaustion and the merits requires a jury trial. Here, there are no material factual disputes on exhaustion, only legal questions remain, so the Court can make its determination based on the record without a hearing. *See Doss v. Gilkey*, 649 F. Supp. 2d 905, 912 (S.D. Ill. 2009).

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey,* 544 F.3d at 740. "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024.

As an inmate in the custody of IDOC, Plaintiff was required to follow the grievance procedure laid out in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, *et seq*. Under the Code, inmates are generally required to follow a three-step process which:

> [B]egins with an attempt by the inmate to resolve the issue informally through a prison counselor, then proceeds to review at the institutional level, and finally ends with an administrative appeal to the director of the Department of Corrections, who has delegated review authority to the ARB.

*Glick v. Walker,* 385 F. App'x 579, 581 (7th Cir. 2010) (citing 20 ILL. ADMIN. CODE §§ 504.810(a), 504.850(a)). Additionally, the Code specifies that the written grievance must:

> [C]ontain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the

individual as possible.

20 ILL. ADMIN. CODE § 504.810(c).

## ANALYSIS

It is not disputed that Grievance #236-7-23 was timely and properly filed at each level of the grievance procedure and ultimately decided on the merits. The issue is whether the grievance contains enough detail to exhaust Plaintiff's claim against Defendants.

In Grievance #236-7-23, Plaintiff describes finding blood in his urine on June 25, 2023, and he complains about his subsequent care and lack of diagnosis. (Doc. 49-1, p. 5-8). Although he discusses his hernia, he does so in relation to finding blood in his urine. He states that when he saw that he was urinating blood on June 25, he started sweating and shaking, and his "stomach hurt really bad" where his hernia is located. Plaintiff describes feeling as though he had lost all his energy and falling to the floor. He asserts that when the correctional officers found him, he was "balled up in pain" because his hernia had "popped out" when he fell to the floor. He also describes showing his hernia to the nurse. Plaintiff recounts how he asked the nurse whether the hernia was the cause of blood in his urine because his hernia was hurting. According to Plaintiff, the nurse informed him of the Wexford policy not to approve surgical repairs for hernias, regardless of pain, unless the hernia is life threatening. Plaintiff writes that this policy was implemented to save money and prevents inmates, "like me," from receiving adequate medical care. He states "I'm just trying to find out if my hernia could be the reason that the blood is in my urine and if that's the case then I would like to get the right tests done to find this out and if it is, then…I want the treatment needed and necessary to fix this so it doesn't continue to happen." (*Id.* at p. 7-8). Plaintiff asks to be "seen by a doctor and or the appropriate tests done so I can know for sure what's going on with me and why blood is coming out of my penis when I go to urinate, because blood is not suppose[d] to be

Page 11 of 16

coming from out of there so its scaring me really bad to see this." (*Id.* at p. 8).

The details in this grievance are insufficient to grieve the Eighth Amendment claims in this case against NP Crane, Dr. Myers, Dr. Babich, and NP Dearmond. Although Plaintiff is grieving the denial of medical care in Grievance #236-7-23, the denial is specific to treatment for and diagnosis of the blood in his urine, not for his hernia itself. He only seeks treatment for his hernia to the extent it "could be the reason that the blood is in [his] urine." (Doc. 49-1, p. 7). In addition to speculating that the blood in his urine is caused by his hernia, Plaintiff also surmises in the grievance that the blood could be a sign of other physical ailments such as cancer, internal bleeding, or something wrong with his kidneys, bladder, or penis. (*Id.* at p. 8). He does not communicate that he is disgruntled with the lack of care specifically for his hernia because of any conduct on the part of Defendants. (*See* Doc. 1, p. 26-27). The Court, therefore, finds that the Eighth Amendment claims against NP Crane, Dr. Myers, Dr. Babich, and NP Dearmond, as alleged in the Complaint, do not fall within scope of the grievance. Grievance #236-7-23 does not serve to exhaust Plaintiff's claims against them in this case. *See King v. Dart,* 63 F.4th 602, 608 (7th Cir. 2023) (finding that the grievance did not give the jail a "fair opportunity to address [the plaintiff's] complaint," where the plaintiff only grieved that "medical staff" were liable for his injuries and delayed care and did not mention correctional staff) (citations omitted).

The Court finds that Grievance #236-7-23, however, does provides enough details regarding Plaintiff's claim against Wexford for its hernia surgical repair policy. Although Plaintiff mentions his hernia only in relation to whether it is the cause of blood in his urine, it is clear from the grievance that he has concerns that his inadequate medical care could be attributed to, in some way, a Wexford policy severely limiting hernia repair surgery. (*See* Doc. 49-1, p. 6). This information was sufficient for the Grievance Officer to investigate and report on Plaintiff's

ongoing care concerning his hernia. (*Id.* at p. 3-4). Plaintiff's reference to the Wexford hernia surgical repair surgery in the grievance alerted the prison he had an issue with the policy and invited corrective action. *Turley v. Rednour,* 729 F.3d 645, 649 (7th Cir. 2013). Thus, Grievance #236-7-23 exhausted Plaintiff's Eighth Amendment claim against Wexford.

As recounted above, Plaintiff also argues that the grievance process was otherwise rendered unavailable to him. He asserts that he filed an emergency grievance in February 2020. (Doc. 53, p. 2). According to Plaintiff, in the emergency grievance, he complained that he was still experiencing pain caused by his hernia and how staff were telling him that Wexford "had a policy to push his hernia back in." (*Id.*). He states he identified Wexford, Wills, Angela Crain, Dr. Siddiqui, and Moldenhauer in the grievance. (*Id.*). Plaintiff alleges that his grievance went unanswered, and then he "was basically threatened by [an] unknown nurse" and "told not to write another one." (Doc. 60, p. 6). Staff losing, misplacing, or destroying a grievance and staff preventing an inmate from filing a grievance by use of threats and intimidation are both examples of an administrative remedy that is not available. *See Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) ("an administrative scheme can be 'unavailable' to a prisoner when a prison fails to respond to a prisoner's grievance"); *Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) ("[a] remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy…"). As the Court has found that Grievance #236-7-23 grieved Plaintiff's Eighth Amendment claim against Wexford regarding its hernia surgical repair policy, the question that remains is whether Plaintiff's remedies were made unavailable as to his Eighth Amendment claims against NP Crane, Dr. Myers, Dr. Babich, and NP Dearmond.

Assuming Plaintiff filed the February 2020 emergency grievance, did not receive a response as he claims, and then was told not to file additional grievances, these facts could not

have rendered the process unavailable to Plaintiff for his claims in this lawsuit against NP Crain, Dr. Myers, Dr. Babich, and NP Dearmond, which occurred three years later. Plaintiff's allegations against these Defendants are that once they were notified of his hernia, as early as June 2023, they did not act in an expeditious manner in having him referred to surgery and did not properly treat his pain in the meantime. Although the Seventh Circuit has held that "prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable conduct is continuing," *Turley,* 729 F.3d at 650, "in no way could [the February 2020 emergency grievance] be construed to object to medical treatment he would subsequently receive" by individual providers years after attempting to file the grievance. *Mayo v. Snyder,* 166 F. App'x 845, 848 (7th Cir. 2006). *See also Barrow v. Wexford Health Sources, Inc.,* 793 F. App'x 420, 423 (7th Cir. 2019). Likewise, being directed not to file a grievance in 2020 does not automatically render the grievance process unavailable in 2023. *See Wallace v. Baldwin*, 55 F.4th 535, 543(7th Cir. 2022) (the unavailability exception to the grievance process is "meant to be narrow"). Plaintiff has not pointed to any evidence in the record, nor does he allege, that the grievance process was unavailable to him in 2023, when he was treated by Defendants. Accordingly, the Court finds that Plaintiff failed to exhaust his available administrative remedies as his claims against NP Crane, Dr. Myers, Dr. Babich, and NP Dearmond. Count 2 shall be dismissed against them in its entirety.

And finally, contrary to Plaintiff's arguments, the medical record itself or the letters Plaintiff allegedly wrote to various Defendants cannot serve to exhaust his Eighth Amendment claims. (Doc. 53, p. 2, 7-8). Attempting to resolve an issue informally is not a substitute for filing a formal grievance. *Dagans v. Cecil,* No. 22-CV-3097-MAB, 2024 WL 3830275, at *5 (S.D. Ill. Aug. 15, 2024) (citations omitted). The grievance procedures are clear that IDOC inmates must

use the grievance forms provided by the correctional facility. *See* 20 ILL. ADMIN CODE § 504.810. Medical records or letters do "not take the place of following an institution's grievance procedures." *Scott v. Baldwin,* No. 19-cv-00528, 2020 WL 5500532, at *5 (S.D. Ill. Sept. 11, 2020).

### DISPOSITION

For the reasons provided, the Court *sua sponte* dismisses without prejudice Count 2 against Wills, Hughes, and Pritzker for failure to state a claim, and Count 2 in part against Wexford to the extent Plaintiff asserts that his Eighth Amendment rights were violated because of Wexford's poor medical record keeping policies and/or practices. In light of these dismissals, the Court will extend Plaintiff's deadline to amend the Complaint to allow him a chance to replead *these claims only*. Plaintiff shall have until **April 21, 2026,** to file a motion for leave to amend the complaint to replead his deliberate indifference claim against the IDOC officials Wills, Hughes, and Pritzker and his record keeping policy claim against Wexford. If Plaintiff chooses to amend, he is reminded to follow the instructions established in the Initial Scheduling and Discovery Order. (Doc. 34, p. 2-3).

The Motion for Summary Judgment filed by Defendants Wills, Hughes, and Pritzker is **DENIED as moot**. (Doc. 45). The Motion for Summary Judgment filed by Wexford, Babich, Dearmond, Crane, and Myers is **GRANTED in part** and **DENIED in part**. (Doc. 48). The Motion is **DENIED as moot** as to Count 2 against Wexford for its record keeping policy and is **DENIED** as to Count 2 against Wexford for its hernia surgical repair policy. The Motion is **GRANTED** as to Plaintiff's Eighth Amendment claims against Babich, Dearmond, Crane, and Myers. Count 2 is dismissed without prejudice in its entirety against Babich, Dearmond, Crane, and Myers for Plaintiff's failure to exhaust his administrative remedies.

Plaintiff is now proceeding only on an Eighth Amendment claim against Wexford for maintaining a policy of prohibiting hernia repair surgeries for inmates unless the hernia is no longer reducible or strangulated in order to save money. The Clerk of Court is **DIRECTED** to terminate Crane, Wills, Hughes, Pritzker, Myers, Babich, and Dearmond as parties on the docket. A discovery schedule will be entered by separate order.

The Motion for Status filed by Plaintiff is **GRANTED** in light of this Order. (Doc. 62).

**IT IS SO ORDERED.**

**DATED: March 31, 2026**

_s/Stephen P. McGlynn_
**STEPHEN P. MCGLYNN**
**United States District Judge**